AO 106 (Rev. 04/10)  Application for a Search Warrant

AUSAs Kim/Martinez

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

In the Matter of the Search of
*(Briefly describe the property to be searched*
*or identify the person by name and address)*

ELECTRONIC DEVICES SEIZED AT
2810 West Ray Street
Indianapolis, Indiana 46221

Case No. 2:18-mj-352

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____Southern_____ District of _____Ohio_____ , there is now concealed *(identify the person or describe the property to be seized)*:

Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC 1951, 1956(h) | Conspiracy to commit extortion, conspiracy to commit money laundering |
| 18 USC 1962 | Conspiracy to commit racketeering |
| 18 USC 1959(a) | Murder in aid of racketeering |

The application is based on these facts:

See attached Affidavit

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Thomas J. Gill, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: April 23, 2018

_____
*Judge's signature*

City and state:  Columbus, Ohio

Honorable Elizabeth P. Deavers, U.S. Magistrate Judge
*Printed name and title*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

IN THE MATTER OF
THE SEARCH OF:

CASE NO. 2:18-mj-352

ELECTRONIC DEVICES SEIZED AT
2810 West Ray Street
Indianapolis, Indiana 46221

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT APPLICATION

I, Thomas Gill, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), assigned to the Columbus Resident Agency for the Southern District of Ohio, Eastern Division, where I have worked for over 21 years. I am currently assigned to the Violent Crimes Squad.  As such, I am  an "investigative or law enforcement officer" of the United States within the meaning of 18 U.S.C § 2510(7), in that I am an officer of the United States empowered by law to conduct criminal investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

2.      During my tenure as a Special Agent with the FBI, I have been assigned to work on various types of investigations, including violent crimes, narcotics offenses, gang investigations, money laundering, and terrorism. I have experience in the execution of search warrants and the debriefing of defendants, witnesses, informants, and other persons who have knowledge of various types of illegal activities. I have experience in the use of sophisticated investigative techniques to include electronic surveillance, GPS tracking devices, telephone tracking, and wiretaps.

3.      For the past 28 months, I, along with other agents and officers from the FBI, Immigrations and Customs Enforcement (ICE), the Columbus Division of Police (CPD), and the Franklin County Sheriff's Office (FCSO), have been investigating the criminal organization called La Mara Salvatrucha, commonly known as MS-13. Over the course of this investigation, I have become familiar with the membership and structure of MS-13 and the nature and scope of criminal activities in which members and associates of the gang engage, both in the Southern District of Ohio and elsewhere.

4.      This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### IDENTIFICATION OF THE DEVICES TO BE EXAMINED

5.      The property to be searched are several electronic devices as described in Attachment A, hereinafter the "Devices," seized pursuant to the judicially authorized search and seizure warrant at the residence of MARTIN NEFTALI AGUILAR-RIVERA, a/k/a Momia, a/k/a Pelon, and JOSE SALVADOR GONZALEZ-CAMPOS, a/k/a Danger, located at 2810 West Ray Street, Indianapolis, Indiana 46221. The Devices are currently located at the FBI Columbus Resident Agency.

6.      The applied-for warrant would authorize the forensic examination of the Devices for the purpose of identifying electronically stored data particularly described in Attachment B.

### PROBABLE CAUSE

7.      Based on my training and experience, as well as information obtained from (i) interviews with sources of information and other witnesses, (ii) investigative reports, (iii) federal and state law enforcement officers from around the United States, (iv) law enforcement   officers

2

in El Salvador, (v) publications regarding the history and structure of MS-13 prepared by federal and state agencies for law enforcement purposes only, and (vi) the ongoing investigation of MS-13 in this district, I am aware of the following facts.

<u>La Mara Salvatrucha</u>

8.     La Mara Salvatrucha, commonly known as MS-13, is a multi-national criminal organization composed primarily of immigrants or descendants of immigrants from El Salvador, Guatemala, and Honduras. Though estimates vary, MS-13 is believed to have 30,000 – 60,000 members around the world. The organization's leadership is based in El Salvador, where many of the gang's high-ranking members are imprisoned.

9.     The name "Mara Salvatrucha" is a combination of several slang terms. "Mara" is the El Salvadoran word for "gang." The phrase "Salvatrucha" is a combination of two words: "Salva" is an abbreviation for "Salvadoran," and "trucha" is a slang word for "fear us," "look out," or "heads up."

10.     MS-13 originated in the United States when El Salvadoran immigrants fled to this county to escape civil war in the 1980s. When these immigrants settled in Southern California, they formed MS-13, which is loosely affiliated with the Mexican Mafia, as a way to protect themselves from other street gangs in the Los Angeles area. MS-13 developed into a dangerous criminal organization that spread to other areas of the United States. A large-scale deportation effort resulted in many MS-13 members and associates being sent back to El Salvador, where the gang grew in size and strength. Thousands of individuals with ties to MS-13 have since entered the United States. (When used in this Affidavit, the term "associate" refers to individuals who associate with MS-13 by engaging in criminal activity, as well as to prospective members of MS-13.)

3

11.     In 2012, the United States government designated MS-13 as a "transnational criminal organization." It is the first and only street gang to receive that designation. MS-13 has become one of the largest criminal organizations in the United States, with more than 10,000 members and associates operating in at least 40 states, including Ohio. MS-13's presence continues to grow in the Southern District of Ohio and around the country, in light of the organization's active recruitment efforts -- which often target juveniles from El Salvador and other Latin American nations – and the regular flow of new, potential members from other states and foreign countries.

12.     In Ohio and elsewhere in the United States, MS-13 is organized into "cliques," which are smaller groups of MS-13 members and associates acting under the larger mantle of the organization and operating in a specific region, city, or part of a city. In order to organize and coordinate the many cliques comprising thousands of members located across the United States, MS-13 leadership in El Salvador has grouped the organization into regional "programs." This structure helps the gang run its operations. Specifically, organizing the various MS-13 cliques into programs facilitates the process of transmitting orders from leadership in El Salvador to cliques in the United States and sending money from cliques in the United States to leadership in El Salvador. MS-13 cliques work both independently and collectively, and generally operate under the umbrella rules of MS-13 leadership in El Salvador. The Columbus, Ohio clique of MS-13 is part of the East Coast Program.

13.     MS-13 cliques meet to discuss, plan, and report on various topics, such as organizational and membership issues, disciplinary problems, recent and future acts of violence and other criminal activity, "green lights" (orders to kill particular individuals), law enforcement activity directed at MS-13 members and associates, and individuals suspected of cooperating

4

with law enforcement. During clique meetings, individual gang members and associates are expected to pay dues to support the organization.

14. In addition to the regular payment of dues, MS-13 cliques raise money through various forms of criminal activity, including extortion and narcotics trafficking. The funds that each clique generates are sent, usually by wire transfer and often through intermediaries, to MS-13 members in El Salvador. Gang leaders use this money to purchase items used to engage in criminal activity (weapons, cell phones, and the like); to provide food, clothing, legal assistance, and other forms of aid to MS-13 members who are incarcerated or have been deported; and to support the families of MS-13 members who have been killed. MS-13 cliques also use the money they generate to purchase firearms or drugs for the clique and to support gang members and associates imprisoned in the United States.

15. MS-13 members have been known to signify their gang membership by getting tattoos. Such tattoos can be words or slogans – such as "Mara Salvatrucha," "MS," "MS-13," or "Laugh Now, Cry Later" – or symbols like the "devil's horns." MS-13 colors generally are blue and white. MS-13 members and associates are not allowed to wear the color red, because red is the color of MS-13's chief rival, the 18th Street gang. MS-13 members sometimes mark their territory through the use of graffiti, though this is becoming less common because of the law enforcement attention it attracts. MS-13 members and associates refer to one another by their gang nicknames. In many instances, they do not know the real names of other gang members and associates. Some MS-13 members and associates are known by more than one nickname.

16. Violence is a central tenet of MS-13. The organization's motto, "mata, viola, controla," means "kill, rape, control." MS-13 members are expected to promote and protect the organization's reputation and status by any means necessary, such as by committing acts of

5

intimation and violence, up to and including murder. Targets of violence include rival gang members, MS-13 members and associates who do not comply with the organization's rules, individuals who show disrespect to the gang or are otherwise perceived as a threat, and those suspected of cooperating with law enforcement. Historically, MS-13 members and associates have committed murders and other violent acts using machetes, knives, and similar bladed weapons in order to intimidate and instill fear in others.

17. MS-13 members and associates in Ohio and elsewhere engage in a wide range of criminal activity, including, but not limited to, racketeering, murder, attempted murder, robbery, extortion, money laundering, drug trafficking, assault, obstruction of justice, witness intimidation, weapons offenses, and immigration-related violations. MS-13 members are expected to commit such acts to maintain membership and discipline within the organization. Participation in violence and other criminal activity increases the level of respect accorded to a member or associate, resulting in that person maintaining or increasing his position in the organization. MS-13 also enforces its authority and promotes discipline by committing or threatening to commit violence, or otherwise punishing, members and associates who do not comply with the organization's rules.

### Operation of MS-13 in the Southern District of Ohio

18. The United States has been aware of the presence of MS-13 in the Southern District of Ohio since the mid-2000s. Enforcement action against the gang over the past decade has met with varying degrees of success. The FBI initiated the current investigation in December 2015, following the discovery of the bodies of two young males who were brutally murdered in Columbus, Ohio earlier that year. (The inquiry into the circumstances of those two homicides is ongoing.) Shortly thereafter, a task force consisting of agents and officers from the

FBI, ICE, CPD, and FCSO was created to focus on the Columbus clique of MS-13 and investigate the organization's criminal activities in this district.

19.     During the course of this investigation, law enforcement learned of MS-13 members and associates engaging in extortion and money laundering in the Southern District of Ohio. This criminal activity spans several years, from roughly 2010 to the present. Through the use of various investigative techniques – including interviews of confidential sources, victims, and other witnesses; physical and electronic surveillance; review of cell phone records, wire transfer records, banking records, and other documents; and consultation with law enforcement officers in other jurisdictions, including El Salvador – the United States has discovered evidence of a conspiracy to commit extortion, money laundering, and related offenses.

20.     MS-13 members and associates have conspired to commit extortion in at least two forms. Some victims received unsolicited telephone calls from co-conspirators. According to the victims, the calls came from El Salvador, Columbus, Ohio, or private numbers that could not be linked to a particular location. The victims knew the callers to be associated with MS-13, either through prior experience or because the callers identified themselves as such. The callers demanded amounts of money ranging from hundreds of dollars to thousands of dollars. The callers threatened to harm the victims and/or their families in both the United States and El Salvador. Victims who agreed to pay were given instructions to send the money via wire transfer to specific individuals located in El Salvador. Victims who initially refused to pay were subjected to more serious threats and, in at least one instance, acts of violence.

21.     Other extortion attempts were even more direct.   Co-conspirators approached victims in person and demanded money. The co-conspirators threatened to harm the victims and/or their families.  In at least one instance, a co-conspirator brandished a firearm during an

7

extortion event. These victims were forced to pay the co-conspirators in cash on a monthly basis, typically around the fifteenth of each month. The co-conspirators usually collected hundreds of dollars from each victim per month.

22.     Sources of information with personal knowledge of the organization's activities in the Southern District of Ohio have advised that co-conspirators discuss their extortion efforts and identify potential targets during MS-13 clique meetings. The co-conspirators maintain logs listing the names the people who are extorted and the amounts of money that the victims pay. The co-conspirators bring these log books to clique meetings. One source described the logs as being thin, blue, spiral notebooks.

23.     The money that the co-conspirators generate through extortion (and other unlawful activities) is used to support MS-13's operations in both El Salvador and the United States. Co-conspirators cause some, if not all, of their extortion proceeds to be sent, usually by wire transfer and often through intermediaries, to MS-13 members and associates in El Salvador. There, the money is used to buy items that the organization uses to engage in criminal activity, to assist MS-13 members who are incarcerated or have been deported, and to aid families of deceased MS-13 members. Co-conspirators also use extortion proceeds to support gang members and associates who are incarcerated in the United States and to purchase drugs and firearms for the Columbus clique.

24.     In furtherance of the financial aspect of this investigation, the United States has reviewed records produced by Western Union, MoneyGram, and Sigue, all of whom offer wire transfer services. Those records reveal that between 2015 and October 2017, the co-conspirators and their associates have been involved in more than 900 wire transfers, with approximately 90% of those transactions directed to recipients in El Salvador (65%), Honduras (22%), and

8

Guatemala (3%). The total amount of money wired in these transactions is approximately $311,000.

25. On July 27, 2017, the grand jury in the Southern District of Ohio returned an Indictment charging the following ten defendants in connection with the criminal conduct described above: JOSE MARTIN NEFTALI AGUILAR-RIVERA, a/k/a Momia, PEDRO ALFONSO OSORIO-FLORES, a/k/a Smokey, JUAN JOSE JIMENEZ-MONTUFAR, a/k/a Chele Trece, ISAIAS ALVARADO, a/k/a Cabo, CRUZ ALBERTO-ARBARNGAS, a/k/a Cruzito, JOSE MANUEL ROMERO-PARADA, a/k/a Russo, JOSE SALINAS-ENRIQUEZ, a/k/a Martillo, JORGE CAZARES, a/k/a Veneno, JOSE RAMIRO APARICIO- OLIVARES, a/k/a Flaco, and NELSON ALEXANDER FLORES, a/k/a Mula. These defendants were charged with conspiracy to commit extortion, using or carrying a firearm during and in relation to a crime of violence, and conspiracy to commit money laundering.

26. On December 14, 2017, the same grand jury returned a Superseding Indictment charging the ten defendants listed above, as well as the following four defendants – JOSE DANIEL GONZALEZ-CAMPOS, a/k/a Flaco, DANIEL ALEXANDER DIAZ-ROMERO, a/k/a Manchas, DENIS DONALDO FUENTES-AVILA, and CAROLINA GARCIA-MIRANDA, a/k/a Mamayema – with conspiracy to commit extortion, using or carrying a firearm during and in relation to a crime of violence, conspiracy to commit money laundering, conspiracy to commit drug trafficking, firearms offenses, obstruction of justice, and immigration offenses.

27. On February 15, 2018, the same grand jury returned a Second Superseding Indictment charging the following twenty-three defendants, in Count One, with conspiracy to commit racketeering, in violation of 18 U.S.C. § 1962(d): MARTIN NEFTALI AGUILAR-RIVERA, a/k/a Momia, a/k/a Pelon, JOSE BONILLA-MEJIA, a/k/a Espia, JUAN JOSE

9

JIMENEZ-MONTUFAR, a/k/a Chele Trece, PEDRO ALFONSO OSORIO-FLORES, a/k/a Smokey, ISAIAS ALVARADO, a/k/a Cabo, CRUZ ALBERTO-ARBARGNAS, a/k/a Cruzito, JOSE MANUEL ROMERO-PARADA, a/k/a Russo, JUAN JOSE ALVARENGA-ALBERTO, a/k/a Sailen, JUAN FLORES-CASTRO, a/k/a Duende, JOSE DANIEL GONZALEZ-CAMPOS, a/k/a Flaco, JOSE SALVADOR GONZALEZ-CAMPOS, a/k/a Danger, JOSE MENDEZ-PERAZA, a/k/a Shadow, ERASMO HUMBERTO LIMA-MARTINEZ, a/k/a Tun Tun, NEHEMIAS JOEL MARTINEZ-HERNANDEZ, a/k/a Mysterio, JOSE CARLOS MERCADO-CRESPIN, a/k/a Payaso, DENIS DONALD FUENTES-AVILA, DANIEL ALEXANDER DIAZ-ROMERO, a/k/a Manchas, GERARDO DAVILA-COLINDRES, a/k/a Cuervo/Enano, MARVIN OTERO-SERRANO, a/k/a Vaca, JORGE ALBERTO LANDAVERDE, a/k/a Grenas, JOSE SALINAS-ENRIQUEZ, a/k/a Martillo, NELSON ALEXANDER FLORES, a/k/a Mula, CAROLINA GARCIA-MIRANDA, a/k/a Mamayema. During the course of this investigation, all twenty-three defendants have been identified as members or associates of MS-13. The Second Superseding Indictment also charges the following:

     a.  Count Two charges MARTIN NEFTALI AGUILAR-RIVERA, a/k/a Momia, a/k/a Pelon, JOSE BONILLA MEJIA, a/k/a Espia, JUAN JOSE JIMENEZ-MONTUFAR, a/k/a Chele Trece, PEDRO ALFONSO OSORIO-FLORES, a/k/a Smokey, ISAIAS ALVARADO, a/k/a Cabo, JOSE MANUEL ROMERO-PARADA, a/k/a Russo, NEHEMIAS JOEL MARTINEZ-HERNANDEZ, a/k/a Mysterio, and JOSE CARLOS MERCADO-CRESPIN, a/k/a Payaso, with murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1).

     b.  Count Three charges MARTIN NEFTALI AGUILAR-RIVERA, a/k/a Momia, a/k/a Pelon, JOSE BONILLA-MEJIA, a/k/a Espia, JUAN JOSE JIMENEZ-MONTUFAR, a/k/a Chele Trece, PEDRO ALFONSO OSORIO-FLORES,

a/k/a Smokey, ISAIAS ALVARADO, a/k/a Cabo, CRUZ ALBERTO-ARBARNGAS, a/k/a Cruzito, JOSE MANUEL ROMERO-PARADA, a/k/a Russo, JUAN JOSE ALVARENGA-ALBERTO, a/k/a Sailen, JUAN FLORES-CASTRO, a/k/a Duende, JOSE DANIEL GONZALEZ-CAMPOS, a/k/a Flaco, JOSE SALVADOR GONZALEZ-CAMPOS, a/k/a Danger, and ERASMO HUMBERTO LIMA-MARTINEZ, a/k/a Tun Tun, with murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1).

c. Count Four charges MARTIN NEFTALI AGUILAR-RIVERA, a/k/a Momia, a/k/a Pelon, JOSE BONILLA-MEJIA, a/k/a Espia, JUAN JOSE JIMENEZ-MONTUFAR, a/k/a Chele Trece, PEDRO ALFONSO OSORIO-FLORES, a/k/a Smokey, ISAIAS ALVARADO, a/k/a Cabo, CRUZ ALBERTO-ARBARGNAS, a/k/a Cruzito, JUAN JOSE ALVARENGA-ALBERTO, a/k/a Sailen, JUAN FLORES-CASTRO, a/k/a Duende, JOSE SALVADOR GONZALEZ-CAMPOS, a/k/a Danger, JOSE MENDEZ-PERAZA, a/k/a Shadow, and JORGE ALBERTO LANDAVERDE, a/k/a Grenas, with murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1).

d. Count Five charges MARTIN NEFTALI AGUILAR-RIVERA, a/k/a Momia, a/k/a Pelon, JOSE BONILLA-MEJIA, a/k/a Espia, JUAN JOSE JIMENEZ-MONTUFAR, a/k/a Chele Trece, PEDRO ALFONSO OSORIO-FLORES, a/k/a Smokey, ISAIAS ALVARADO, a/k/a Cabo, CRUZ ALBERTO-ARBARGNAS, a/k/a Cruzito, JUAN JOSE ALVARENGA-ALBERTO, a/k/a Sailen, JUAN FLORES-CASTRO, a/k/a Duende, JOSE SALVADOR GONZALEZ-CAMPOS, a/k/a Danger, JOSE MENDEZ-PERAZA, a/k/a Shadow, and JORGE ALBERTO LANDAVERDE, a/k/a Grenas, with murder through the use of a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A).

e. Counts Six through Fifteen charge various defendants with firearms offenses, drug trafficking offenses, obstruction of justice, and immigration offenses. (*See United States v. Aguilar-Rivera, et al.*, Case No. 2:17-CR-164, ECF No. 179.)

11

28.     Based on the facts in this Affidavit as well as my training and experience and the training and experience of other law enforcement officers involved in this investigation, I am aware of the following:

    a.   Gang members and associates are usually required to attend meetings during which the organization's business is discussed and dues are collected for the purpose of supporting the gang's operations. Gang members and associates often maintain records, such as rosters, reflecting who attended such meetings, who paid dues, and how much was paid in dues. These documents may also identify rival gang members and others whom the gang is targeting for violence. Gang members and associates typically keep these sorts of records at their residences or in their vehicles.

    b.   Gang members and associates who engage in extortion often maintain logs or other records identifying their victims and tracking the amounts of money they are forced to pay. Gang members and associates normally keep such logs at their residences or in their vehicles.

    c.   Gang members and associates often utilize firearms and other weapons to facilitate the commission of acts of violence, such as extortion.  For this reason, gang members and associates regularly carry weapons or store them in their residences or vehicles.

    d.   Gang members and associates launder funds they generate through unlawful activities, such as extortion, by various means, including using wire transfer services to move money from one location to another, in order to conceal the nature and source of the funds and/or promote the organization's ongoing illegal conduct.  Gang members and associates have also been known to work

in cash-only businesses, and as a result, they can commingle the proceeds of their criminal conduct with funds earned through legitimate employment.

e. Members and associates of gangs that are national or international in scope often use computers and other electronic devices to connect with members and associates in other locations. For example, gang members and associates access social networking websites with messaging capability or e-mail to contact members and associates in other locations, share photographs and videos, and so forth.

f. Gang members and associates regularly use cellular telephones as well as other mobile digital devices to communicate with co-conspirators, victims, and others involved in illegal activity. These individuals commonly maintain names, telephone numbers, addresses, audio and video files, e-mail and text messages, and photographs concerning their criminal conduct in those telephones and digital storage devices. Gang members and associates often keep their cell phones on their person or in their residences or vehicles.

The types of documents, records, electronic devices, and other evidence described above typically are found at gang members' residences, in their vehicles, or on their person. Such items constitute evidence of the criminal activity under investigation. Moreover, such items could lead to additional evidence of this and related criminal conduct and could help identify and locate other co-conspirators.

29. On or about August 14, 2017, a search and seizure warrant for 2810 West Ray Street, Indianapolis, Indiana 46221, a residence believed to be used by JOSE MARTIN NEFTALI AGUILAR-RIVERA, a/k/a Momia, a/k/a Pelon, and JOSE SALVADOR GONZALEZ-CAMPOS, a/k/a Danger, was issued by the United States District Court for the Southern District of Indiana. The United States learned of this location after receiving judicially authorized cellular

13

location information on a cell phone that was being used by AGUILAR-RIVERA. While conducting surveillance in the area of 2810 West Ray Street, investigators observed a vehicle known to be operated by AGUILAR-RIVERA parked in the driveway of this residence on multiple occasions between August 3, 2017 and August 8, 2017. In addition, GPS cell phone location information for the cell phone known to be used by AGUILAR-RIVERA consistently showed AGUILAR-RIVERA'S phone to be in the area of this residence during all hours of the day and night since July 2017. Investigators used cellular location information to track AGUILAR-RIVERA as he moved between Columbus, Ohio and Indianapolis, Indiana, and had seen him driving the same vehicle that had been parked in the driveway at 2810 West Ray Street.

30. On August 15, 2017, law enforcement officers executed a judicially authorized arrest warrant for AGUILAR-RIVERA at 2810 West Ray Street, Indianapolis, Indiana 46221. During the judicially authorized execution of the arrest warrant for AGUILAR-RIVERA, investigators discovered JOSE SALVADOR GONZALEZ-CAMPOS, a/k/a Danger, at 2810 West Ray Street, Indianapolis, Indiana 46221, during which GONZALEZ-CAMPOS, a/k/a Danger, was administratively arrested for immigration offenses.

31. On August 15, 2017, during the judicially authorized execution of the search and seizure warrant at 2810 West Ray Street, Indianapolis, Indiana 46221, law enforcement officers seized the Devices. Some of the Devices were identified as belonging to AGUILAR-RIVERA, a/k/a Momia, a/k/a Pelon, and GONZALEZ-CAMPOS, a/k/a Danger. Your Affiant knows that gang members and associates regularly use cellular telephones to communicate with co-conspirators, victims, and others involved in illegal activity. These individuals commonly maintain names, telephone numbers, addresses, audio and video files, e-mail and text messages, and photographs concerning their criminal conduct in those telephones and digital storage devices.

14

Gang members and associates often keep their electronic devices on their person or in their residences. Therefore, while the FBI might already have all necessary authority to examine the cellular phones, I seek this additional warrant out of an abundance of caution to be certain that an examination of the cellular phones will comply with the Fourth Amendment and other applicable laws.

32. The cellular phones are currently in storage at the FBI Columbus Resident Agency. In my training and experience, I know that the cellular phones have been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as it was when the cellular phones first came into the possession of the FBI.

### TECHNICAL TERMS

33. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. *Wireless telephone*: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments,

15

and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. *Digital camera*: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. *Portable media player*: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. *GPS*: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices

16

can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. *PDA*: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. *IP Address*: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers,

17

each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

g. *Internet*: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

34.     Based on my training, experience, and research, I know that the Devices have capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

35.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

36.     *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as   direct

18

evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Device was used, the purpose of its use, who used it, and when. There is probable cause to believe that this forensic electronic evidence might be on the Device because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

b. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

c. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

      d.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

37.    *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

38.    *Manner of execution.* Because this warrant seeks only permission to examine a cellular phone already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## **CONCLUSION**

39.    I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the Devices described in Attachment A to seek the items described in Attachment B.

Respectfully submitted,

Thomas J. Gill
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _April 23_, 2018.

HONORABLE ELIZABETH PRESTON DEAVERS
United States Magistrate Judge

## ATTACHMENT A

The property to be searched are the following electronic devices, which were lawfully obtained during the judicially authorized search of 2810 West Ray Street, Indianapolis, Indiana 46221, hereinafter the "Devices":

1. **FBI Item 5: One (1) cell phone**

   a. LG cell phone (black), Model LS675, S/N: 606VTTD1554985

2. **FBI Item 6: One (1) cell phone**

   a. Samsung cell phone (black and silver flip phone), Model SCH-U680, MEID: A00000453D066A

3. **FBI Item 7: One (1) cell phone**

   a. Apple iPhone (white), Model A1533, IMEI: 013888000991938

4. **FBI Item 26: One (1) cell phone**

   a. LG cell phone (silver and black), Model LGMS345, S/N: 510CYKJ480005

5. **FBI Item 27: One (1) cell phone**

   a. LG Cricket cell phone (silver and black), Model LG-M430, S/N: 705VTRG061046

## ATTACHMENT B

1.      All records on the cellular phones described in Attachment A that relate to violations of 18 U.S.C. §§ 1951, 924(c), 841, 1956(h), and/or 1962, including:

  a.   Any and all indicia of ownership, possession, control, or dominion of the Devices, including usernames, passwords, registrations, photographs of people, stored voice mail messages, text messages, and email messages identifying the sender of messages from the device or the recipient of messages sent to the device;

  b.   Any and all indicia of membership in or association with the transnational criminal organization known as La Mara Salvatrucha, or MS-13, including but not limited to correspondence, text messages, email messages, rosters, logs, notes, contact information, address books, photographs, audio and video recordings, and any other items consistent with membership in or association with MS-13;

  c.   Any and all records and information related to the identity or location of any other individuals who are associated with MS-13, including but not limited to correspondence, text messages, email messages, rosters, logs, notes, contact information, address books, photographs, audio and video recordings, and any other items consistent with membership in or association with MS-13;

  d.   Any and all records and information identifying victims of, or amounts of money or other things of value paid as a result of, extortion and related criminal activity;

  e.   Any and all records and information related to the receipt, deposit, or transmission of funds of any kind, including but not limited to wire transfer records, bank

records, checks, credit card bills, account information, receipts, and other financial records and information;

f.  Any and all other records or information concerning violations of 18 U.S.C. §§ 1951, 841, 924(c), 1956(h), 1962, and related offenses.

2.    Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.